IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| ROBERT H. MCCURREN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 2:17-CV-04020-MDH |
| | ) |
| DR. PEPPER/SEVEN UP, INC., et al., | ) |
| | ) |
| Defendants. | ) |

## ORDER

Before the Court is Defendants' Motion for Summary Judgment (Doc. 61). The Court has carefully considered the motion and related legal suggestions. As set forth herein, Defendants' Motion for Summary Judgment is granted.

## BACKGROUND

Plaintiff Robert H. McCurren, III was born on September 12, 1950. He began working for Dr. Pepper in 1974. In 1980, Plaintiff began working with defendant Matson, and they worked closely together from 1980 until 2010. Beginning in 2010, through 2015, Matson was employed as Plaintiff's indirect supervisor. Plaintiff was the oldest person in the Jefferson City branch of Dr. Pepper at the time of his termination.

The structure and names of Dr. Pepper entities underwent changes during Plaintiff's career. Defendants state ABC was the entity that employed Plaintiff and Matson at the time of his termination. Plaintiff claims he was terminated on Dr. Pepper letterhead and at the direction of Dr. Pepper employees. Plaintiff further argues the zero tolerance policy for which he was allegedly terminated was from the Dr. Pepper handbook.

1

Plaintiff's final title at ABC was Branch Manager. In that position, Plaintiff oversaw and managed eleven different branches. As Branch Manager, Plaintiff reported directly to Dan Schmidt ("Schmidt") and indirectly to Matson, who was Schmidt's direct supervisor. At the time of Plaintiff's termination, Matson was 63 years old and was the Regional Vice President for the Mid-South Region of ABC. Matson remains in that position. Plaintiff's annual performance evaluations were conducted by Schmidt and there were no concerns about the annual performance evaluations for the last two years Plaintiff was evaluated.

As Branch Manager, Plaintiff's direct reports included: Janet Chinn (admin), Jim Robertson (vendor tech), Rick Ryals (vendor tech), Ron Endecott (district manager), Paul Annable (district manager), Mike Armstrong (district manager), Justin Hutto, and Chris Hilke (district manager). Plaintiff conducted performance reviews of his direct reports. He was also responsible for disciplining or coaching his direct reports if they needed disciplining or coaching.

From time to time, ABC held sales meetings in its Jefferson City, Missouri office. Distributors and other ABC employees, including Plaintiff and Matson, were invited to those meetings. The purpose of the meetings was to identify the state of business and any plans to improve or change the business. After the meetings concluded and work was finished for the day, the attendees occasionally had dinner in the warehouse attached to the back of the Jefferson City office. Some distributors brought beer to the post-meeting dinners, and the beer was available for anyone to drink (so long as they did not drink and drive). ABC also provides alcohol at events such as the employee Christmas party. ABC allows its employees to purchase alcohol on a company credit card when employees are traveling on business, and after business has ended for the day. It also allows its employees to consume alcohol when entertaining customers.

Plaintiff understood that he was responsible for reviewing and understanding the company's policies. He was also responsible for making sure his direct reports reviewed and acknowledged those policies. The Dr. Pepper Snapple Group Code of Conduct was one of the policies Plaintiff was responsible for reviewing and understanding. The Code of Conduct states:

Compliance starts with you, and you are responsible for:

- Understanding and complying with our Code and related policies.
- Familiarizing yourself with and following the laws and regulations that apply to our business and your job.
- Acting with the highest standards of ethics and integrity.
- Reporting violations and misconduct.

The Code of Conduct further states the company is "committed to creating a positive and diverse workplace that is free from discrimination and harassment." Plaintiff understood that was the policy of the company. Plaintiff understood failure to comply with the Code of Conduct may lead to disciplinary action, including termination for cause.

To assist the company in enforcing the Code of Conduct and investigating any violations of the Code (or of related policies), the company provides an "anonymous Speaking Up! hotline," which employees can call "any time 24 hours a day, 365 days a year." Employees may also submit anonymously to the Speaking Up! website. The Dr. Pepper Snapple Group Employee Handbook contained additional applicable policies, which Plaintiff acknowledged receiving and reviewing. From the Employee Handbook, Plaintiff understood the company's policy was to ensure equal employment opportunities were given to people without regard to age, among other protected categories.

The Employee Handbook also contained the company's policy on a Drug-Free Workplace, which states that "alcohol misuse by employees subject[s] the Company to unacceptable risks of

workplace accidents or other failures that would undermine the Company's ability to operate safely and efficiently." The Drug-Free Workplace policy further states:

> The Company strictly prohibits the use, sale, possession, distribution, dispensation, manufacture, or transfer of illegal drugs or alcohol on the Company property or other worksites where employees may be assigned or elsewhere during work hours. . . . Additionally, no agent, employee or contractor shall report to work while under the influence of illegal drugs or alcohol. Persons violating this policy will be subject to disciplinary action, including termination for a first offense.

The zero-tolerance alcohol policy, as written, applied to all employees.

Plaintiff also received a copy of the Health, Safety and Work Rules for Hazelwood and Jefferson City Locations ("Safety Rules"). Under the Safety Rules, "[p]ossession of alcohol or non-prescribed controlled substances during work time" and "[r]eporting to work under the influence of intoxicants, narcotics, and/or drugs not medically required" may subject an employee to "immediate suspension, without compensation, pending investigation for termination."

In August 2015, a Dr. Pepper distributor that covered territory in northwest Arkansas suddenly went out of business. Because Matson's region was the closest to Arkansas, Matson was asked to put together a plan to service the customers of that area, preferably before the upcoming Labor Day shopping period, which was key for the company. Matson asked Plaintiff to go down to that region and help cover the territory until a more permanent solution could be implemented. Plaintiff and a rotating team of other ABC employees worked out of a warehouse in Poplar Bluff, Missouri, which allowed them to reach the Arkansas territory previously covered by the then-defunct distributor. Plaintiff and his team handled product sales, loading product onto trucks, and delivering product from the Poplar Bluff warehouse to customers in the Arkansas territory. The warehouse where the Poplar Bluff team worked was owned by Kohlfeld Distributing, a beer and beverage distributor.

The names and ages of employees who worked at Poplar Bluff include the following (ages listed as of November 1, 2015):

| Employee Name | Age of employee |
| --- | --- |
| Annable, Paul E | 57 |
| Robertson, James D | 52 |
| Hutto, Justin H | 48 |
| Armstrong, Michael J | 59 |
| Hilke, Christopher S | 44 |
| Endecott, Ronald R | 63 |
| McCurren, Robert H | 65 |
| Cross, Loy W | 64 |
| Ryals, Richard L | 56 |
| Gandlmayr, Matt | 25 |
| Robinson, Brad | 40 |
| Cunningham, Ed | 49 |
| Fox, David | 46 |
| Nickles, Lee | 49 |

Matson was in Poplar Bluff for about the first week and a half of operations and then left near the end of the week after Labor Day 2015. Matson traveled back to Poplar Bluff an additional two or three times.

Between August and November 2015, Plaintiff spent about seventy-five percent of his work time in Poplar Bluff. Although Plaintiff claims he was not in charge of the operation, and that Matson was in charge of the project, many of the other employees who helped on this project were Plaintiff's direct reports. In Poplar Bluff, Plaintiff and the other employees typically started at the warehouse at about 4:30 a.m. and ran routes to get Dr. Pepper product to customers. They typically returned to the warehouse around 3:30 or 4:00 in the afternoon.

Toward the end of the day, Plaintiff and the other employees would build pallets (i.e., load product onto pallets for delivery the next day). Plaintiff admits building pallets is work, but states that it is not part of his job and he was not required to do so. Plaintiff stated he decided when his

day was done and when he built pallets it was only to help the others because it was hard work, but he was not required to do so. While building pallets toward the end of the day in the Poplar Bluff warehouse, Plaintiff sometimes drank beer. Plaintiff states the end of his work day was not the same as others. At least two employees, who reported directly to Plaintiff, have stated they witnessed having to move Plaintiff's beer in order to load a pallet. One of Plaintiff's direct reports observed Plaintiff visibly impaired at the warehouse on more than one occasion, and witnessed Plaintiff spill beer on the warehouse floor. Plaintiff denies this happened. One of Plaintiff's direct reports, Robertson, stated that Plaintiff's workplace drinking was frustrating and that he expected a management level employee like Plaintiff to be the leader in the warehouse. However, Robertson never complained to Plaintiff and failed to complain to Plaintiff's supervisor. Plaintiff admits he also brought a bottle of Crown Royal to the warehouse, but argues he brought it to warehouse manager Steve Faulkner at his request.

Plaintiff claims other employees also drank beer. Plaintiff admits Schmidt did not consume alcohol in Poplar Bluff. However, Plaintiff argues Matson knew the distributor was giving beer to his employees working in the Poplar Bluff area and that Matson observed employees drinking in an office in Poplar Bluff. There is no evidence Matson consumed alcohol in Poplar Bluff. Plaintiff's testimony states, "I don't know if Bob drank…." Plaintiff does not allege Matson was drinking while working in Poplar Bluff. However, Plaintiff states other employees drank alcohol in Poplar Bluff and were not terminated.

On October 19, 2015, an anonymous caller placed a call to Dr. Pepper's Speaking Up line. The caller reported that Plaintiff "has been working under the influence of alcohol." The caller reported observing the conduct in issue, that the conduct was an ongoing issue, and had most recently occurred on October 6, 2015. The details of the call were recorded in a Global Compliance

6

Alertline System Report (the "Speaking Up Complaint"), which Jennifer Maupin (then-HR Manager for Dr. Pepper Snapple Group) received in mid-October 2015. After receiving the Speaking Up Complaint, Maupin spoke with Plaintiff's immediate supervisor, Dan Schmidt. Schmidt set up a phone call between Plaintiff, Maupin, and Schmidt. During that call, Maupin informed Plaintiff that the company had received a Speaking Up complaint alleging Plaintiff had been drinking alcohol during working hours. Maupin also informed Plaintiff that she and Schmidt would be speaking to people about the alcohol allegations, and asked Plaintiff to please let them do their job. Plaintiff responded "go ahead, talk to whoever you want to. I wouldn't do that."[1]

Following the call with Plaintiff, Schmidt gave Maupin names of individuals who would have worked in Poplar Bluff with Plaintiff. Maupin, Schmidt, and/or Ryan Smith (Maupin's supervisor) ultimately interviewed nine individuals about the Speaking Up Complaint. They are, in chronological order of interview: Chris Hilke (interviewed 10/28/2015), Paul Annable (interviewed 10/28/2015), Mike Armstrong (interviewed 10/28/2015), Matt Gandlmayr (interviewed 10/29/2015), Wayne Cross (interviewed 10/29/2015), Brad Robinson (interviewed 10/29/2015), Lee Nichols (interviewed 10/29/2015), Justin Hutto (interviewed 10/29/2015), and Rick Ryals (interviewed 10/29/2015). Matson did not participate in those interviews or the subsequent investigation. Four of the nine interviewed employees—Armstrong, Gandlmayr, Hutto, and Ryals—reported observing Plaintiff drink alcohol at the Poplar Bluff warehouse during work hours. In his interview, Mike Armstrong reported Plaintiff would start drinking beer when there was about a half hour of pallet building left. Armstrong also identified a perception that Plaintiff felt "untouchable." In his interview, Matt Gandlmayr reported observing Plaintiff drinking alcohol at the Poplar Bluff warehouse on at least three occasions. Gandlmayr further

---

[1] Plaintiff states it is "controverted" as to what he meant by "I wouldn't do that."

indicated that Plaintiff offered Gandlmayr a beer once, but Gandlmayr thought it was a "test" and turned it down. In his interview, Justin Hutto reported that Plaintiff's drinking had gotten progressively worse over the last year and a half. Hutto also reported Plaintiff almost "clipped" someone on a sidewalk while driving under the influence, and had to pull over to have someone else take over driving. In his interview, Rick Ryals reported that Plaintiff's drinking had increased over the past couple of years, and that he saw Plaintiff drink during the work day at least eight times in the Poplar Bluff warehouse. Ryals was concerned that Plaintiff's drinking had "crossed the line."

After interviewing the nine employee witnesses, Maupin held a formal interview with Plaintiff on November 2, 2015. Maupin and HR Manager Wendy Tullis both took notes during that interview, which Maupin later turned into a summary. During the interview, Plaintiff answered "yes" when asked if he drank alcohol in the Poplar Bluff warehouse. Specifically, Plaintiff admitted to drinking in the Poplar Bluff warehouse "When we were loading trucks." Defendants argue Plaintiff had previously denied drinking in the warehouse when stating "I wouldn't do that." Plaintiff disputes what was meant by "I wouldn't do that." Plaintiff argues he meant he wouldn't interfere with the investigation. Regardless, Plaintiff admits to drinking both beer and Crown Royal in the warehouse.

During the interview process, Plaintiff claimed that other ABC employees consumed alcohol in the warehouse. Specifically, he stated that "[t]he District Managers were there, some were drinking." When asked to identify which District Managers were drinking, Plaintiff named Chris Hilke and Steve Faulkner (who was not an ABC employee), then said "I didn't take notes."

District Managers manage a territory, but do not manage any people. Through the course of the investigation, the Company had difficulty determining which District Managers consumed

alcohol, but ultimately determined not to discipline those people because their manager, and the highest ranking employee at the site on many occasions (Plaintiff) was openly condoning and participating in it, and even offering it to other employees. The Company felt it would be difficult to discharge those employees given the example their manager had set. The Company opted, instead, to hold a meeting after Plaintiff's termination to reinforce the policy so it was clear to the employees, going forward, that violation of the policy would not be tolerated.

In early November 2015, Maupin met with her direct supervisor, Ryan Smith (HR Director at Dr Pepper Snapple Group), and Smith's supervisor, Michael Studdard (VP of HR), to discuss the results of the investigation into Plaintiff's drinking on the job. During that conversation, Maupin, Smith, and Studdard jointly decided to recommend terminating Plaintiff's employment. Plaintiff also claims that this group also met with an attorney named Elizabeth. There was no particular leader in that decision-making process; rather, it was something the three of them arrived at collaboratively. Maupin, Smith, and Studdard felt termination was warranted because, as a branch manager who was responsible for all the operations and employees for his area, Plaintiff should have had a higher standard and should have been upholding policy and enforcing it among his subordinates rather than violating it. These decision makers felt that Plaintiff, as a supervisor and manager at this location, should be held to a higher standard.

Once Maupin, Smith, and Studdard decided to recommend terminating Plaintiff's employment, someone called Matson to deliver the recommendation. The group believed the recommendation was just that—a recommendation, with which the business side of the company "can either agree or disagree" and reach its own conclusion. Matson, however, did not view the call as a recommendation. In his mind, the "decision had been made" by the "corporate HR" group to proceed with terminating Plaintiff's employment. Matson did not believe he had the ability to

change that decision. Believing the termination decision was final, Matson felt it was his professional responsibility as the Regional Vice President to deliver the termination decision to Plaintiff. Matson also felt a personal obligation to communicate the termination decision to Plaintiff because he valued his longstanding personal relationship with Plaintiff, which dated back to at least 1980, and felt that "if that message had to be communicated . . . it was on me to do that." Matson also thought challenging the termination may possibly have a negative impact on himself.

Maupin then drafted a termination letter for Matson's signature. On November 12, 2015, Maupin and Matson met with Plaintiff to inform Plaintiff his employment was being terminated. For Matson, because of his longstanding relationship with Plaintiff, that day was "probably one of the most difficult, painful days of my career." ABC asked Paul Annable, then a District Manager and one of Plaintiff's (former) direct reports, to fill Plaintiff's position on an interim basis. At the time he took over as interim Branch Manager in November 2015, Annable was 57 years old. Annable had been with the company since 1980. Annable was later hired as the permanent Branch Manager. After Plaintiff's termination, Dan Schmidt and Kay Slover, a Human Resources Manager located in St. Louis, met with Plaintiff's direct reports to review the policy prohibiting drinking on the job (among other things), to ensure they all understood that conduct was prohibited and would likely result in termination. Plaintiff was the only employee terminated for violation of the zero-tolerance alcohol policy because he was upper level management. Plaintiff was the senior manager on site.

In this lawsuit, Plaintiff claims his employment was terminated because of his age. Plaintiff does not have any complaints about the way he was treated at ABC prior to the termination of his employment. During the approximately 41.5 years Plaintiff worked for Dr. Pepper, or for ABC, he does not recall witnessing any specific act of age discrimination against anyone other than

himself. When asked at his deposition to identify the reasons he believed his termination was related to age, Plaintiff identified only two: (1) other people also drank at the warehouse and those individuals were not fired; and (2) "Maybe because of my pay grade." Plaintiff was not sure about the second reason, qualifying it with "I don't – I don't know that, but maybe." Plaintiff has not identified any other reasons why he believes his termination was related to age.

Plaintiff states he had reached his maximum in pay that would be allowed and Defendants could not give him salary increases, but only annual one-time merit bonuses. Plaintiff states he discussed his retirement specifically with Matson, and with "Dr. Pepper," on many occasions and was preparing to retire at age 70. Plaintiff also makes the general allegations that employees of Dr. Pepper made fun of older employees, but does not allege it was any of his supervisors or the decision makers involved in his termination. From the record, it appears the "jokes" made about older employees were made by warehouse employees, employees that Plaintiff supervised.

Finally, Plaintiff states alcohol consumption was allowed at social events, and even paid for, by Dr. Pepper for customers and suppliers. Plaintiff states employees drank at sales meetings and used those opportunities to build relationships with and between distributors and employees of Dr. Pepper.

## STANDARD OF REVIEW

Summary judgment is proper if, viewing the record in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp., v. Catrett,* 477 U.S. 317, 322-23, 106 S. Ct. 2548 (1986). The moving party is entitled to summary judgment as a matter of law if they can establish there is "no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S. Ct. 2505, 2510, (1986). Once the moving party has established a

properly supported motion for summary judgment, the non-moving party cannot rest on allegations or denials but must set forth specific facts showing that there is a genuine issue for trial. *Id.* at 248.

A question of material fact is not required to be resolved conclusively in favor of the party asserting its existence. Rather, all that is required is sufficient evidence supporting the factual dispute that would require a jury to resolve the differing versions of truth at trial. *Id.* at 248-249. In addition, "while employment discrimination cases are often fact intensive and dependent on nuance in the workplace, they are not immune from summary judgment." *Shirrell v. Saint Francis Med. Ctr.*, 24 F. Supp. 3d 851, 855-56 (E.D. Mo. 2014); citing *Fercello v. County of Ramsey*, 612 F.3d 1069, 1077 (8th Cir. 2010); citing *Berg v. Norand Corp.*, 169 F.3d 1140, 1144 (8th Cir. 1999). In fact, there is no separate summary judgment standard for employment discrimination cases, and "it remains a useful pretrial tool to determine whether or not any case, including one alleging discrimination, merits a trial." *Id.*

## **DISCUSSION**

The parties appear to agree on the standard to apply to Plaintiff's claims under the MHRA. Here, "plaintiff can prove discrimination by showing [that] age or any protected characteristic[ ] was a contributing factor for the employment action regardless if other factors also exist." *Reed v. Kansas City Missouri Sch. Dist.,* 504 S.W.3d 235, 240 (Mo. Ct. App. 2016). Plaintiff must show: 1) he was terminated; 2) that his age was a contributing factor in the termination; and 3) that he sustained damage as a result. See *Daugherty v. City of Maryland Heights*, 231 S.W.3d 814, 818–19 (Mo. 2007), overturned due to legislative action.[2]

---

[2] "The MHRA amendments have only been in effect for months, but a division of this Court and most of the Missouri circuit courts have determined the amendments cannot be applied retrospectively." *Hurley v. Vendtech-SGI, LLC*, No. 16-01222-CV-W-ODS, 2018 WL 736057, at *4 (W.D. Mo. Feb. 6, 2018). "The MHRA was amended, effective August 28, 2017. There are two amendments to the MHRA…(1) the modification of the causation standard, and (2) the

12

Defendants argue that they are entitled to summary judgment because Plaintiff cannot provide evidence that age was a contributing factor in the decision to terminate his employment. Defendants state it is undisputed that Plaintiff was the senior most employee and supervisor of the Poplar Bluff warehouse. Further, Plaintiff was subject to a policy against drinking alcohol while working, and violated that policy by drinking beer while, at a minimum, other employees were building pallets in the warehouse. In addition, other employees drank at the warehouse, and Plaintiff, as their supervisor, was aware of the onsite drinking. An anonymous caller reported Plaintiff's policy violation to a tip line and the complaint was investigated. Plaintiff admitted drinking at the warehouse during working hours, but claims others were also found to be drinking. Dr. Pepper terminated Plaintiff, as the supervisor of the warehouse, for this violation. Other employees who were found to have violated the policy were not terminated. Dr. Pepper felt Plaintiff, as the manager, had openly condoned and participated in drinking, and had offered alcohol to employees during the workday. As a result, based on the actions of Plaintiff, as the manager, they determined not to terminate the other employees for this conduct. Instead, after Plaintiff's termination, a meeting was held with all employees reinforcing the company's policies and that future violations would not be tolerated.

For the most part, the facts are undisputed in this case. Plaintiff admits during his 41.5 years he worked for Dr. Pepper, or for ABC, he did not recall any acts of age discrimination against himself or others. He further admits that he was the senior manager located at the warehouse and that he himself violated the alcohol policy. An anonymous complaint was made to the company's hotline, and as a result an investigation occurred in which Plaintiff and nine of his co-workers were

---

legislature's instruction to courts to apply a burden-shifting framework when analyzing a summary judgment motion." *Id.* at *3. Plaintiff filed his lawsuit on December 26, 2016 in Cole County, Missouri.

interviewed. Numerous employees who were interviewed reported seeing Plaintiff drink regularly during work hours. Plaintiff does not dispute that the complaint was made and an investigation was conducted.

Plaintiff bases his claim that age contributed to his termination on the undisputed fact that other employees also drank at the warehouse and were not fired. However, Plaintiff provides no evidence that the other employees were similarly situated to Plaintiff. For example it is undisputed that Plaintiff was the most senior employee at the warehouse. Plaintiff was a supervisor, and as a result, responsible for other warehouse employees' conduct. Plaintiff's violation of the policy, at a minimum, set an example for the other employees working at the warehouse or, arguably, condoned the drinking at the warehouse under his supervision.

Plaintiff also argues that he was fired "*maybe* because of his pay grade." (*emphasis added*). However, again, Plaintiff has provided no evidence to support this allegation. Defendants have provided undisputed evidence that Plaintiff was the supervisor responsible for overseeing the warehouse and that he violated the alcohol policy while working in that position. While other employees were found to have violated the policy, no other employees were supervisors at the warehouse. Plaintiff argues he was "held to a different standard." However, Plaintiff's role as a supervisor is different than the roles held by other employees. Furthermore, the fact Plaintiff was held to a different standard is not evidence of age discrimination. Plaintiff argues he was held to a different standard, but has offered no evidence to support a claim that his age contributed to his termination, let alone the "different standard" he felt was applied to him.

Plaintiff also claims that defendant Bob Matson questioned Plaintiff about his retirement and that this is evidence of discrimination. However, the Court finds that taking these conversations in the context of the undisputed facts they do not support Plaintiff's claims. It is

14

undisputed that Matson and Plaintiff were friends and had worked together at Dr. Pepper since 1980. They worked closely together for approximately 30 years, from 1980 until 2010. From 2010 to 2015, Matson was Plaintiff's indirect supervisor. At the time of Plaintiff's termination, his direct supervisor was Dan Schmidt, not Matson. Matson was 63 years old at the time of Plaintiff's termination. Plaintiff claims Matson's conversations with him regarding retirement were discriminatory. However, Plaintiff alleges nothing more than the fact that he had discussed retiring at age 70 with Matson, and that they had retirement discussions. Plaintiff does not make any claims that Matson said anything derogatory regarding Plaintiff or his age based on their retirement conversations. The Court finds the mere fact that Matson discussed retirement with Plaintiff, after both employees had worked together for 30 years, admittedly were friends, and both were in their 60s does not on its face, without more evidence, represent any discriminatory animus upon which Plaintiff could support his claim based on age discrimination.

Finally, Plaintiff's Petition and deposition testimony indirectly cite to the fact that Paul Annable replaced him as further evidence to support his claim. Plaintiff does not provide argument to support this claim in the summary judgment briefing. However, Annable had also been with the company since 1980 at the time he was promoted, he was 57 years old, and was a District Manager that had reported directly to Plaintiff. After Plaintiff's termination, Annable was asked to fill Plaintiff's position on a temporary basis, and then was later hired as the permanent branch manager. Again, this alone is not sufficient evidence to survive summary judgment.

For the reasons set forth herein, the Court finds Plaintiff has failed to establish that age was a contributing factor to his termination, and finds summary judgment in favor of Defendants is justified.

## CONCLUSION

For the reasons set forth herein, the Court hereby **GRANTS** Defendants' Motion for Summary Judgment. (Doc. 61).

**IT IS SO ORDERED.**

DATED: August 20, 2018

                                               */s/ Douglas Harpool*
                                               **DOUGLAS HARPOOL**
                                               **UNITED STATES DISTRICT JUDGE**